# FALL SESSIONS,
## 1910·

STATE *vs.* BENJAMIN RUBIN.

*Larceny : Elements—Necessary Proofs—Asportation—Circumstantial Evidence—Sufficiency for Conviction.*

1.   In a prosecution for larceny, it is incumbent upon the State to establish every material element of the crime, to warrant a conviction of the accused.

2.   In a prosecution for larceny, it is necessary to show the asportation of the alleged stolen property by the accused, either by direct or circumstantial evidence.

3.   Circumstantial evidence when it establishes, or strongly tends to establish, the guilt of the accused may, like positive testimony, be relied upon for a conviction.

4.   Circumstantial evidence when relied upon for a conviction must be such in character as to create in the mind more than a mere suspicion of guilt.

5.   Circumstantial evidence, when relied upon for a conviction, must be of such a character as to exclude any reasonable conclusion other than the guilt of the accused.   Mere probability of guilt is not enough.

6.   In order to warrant a conviction on circumstantial evidence, it must (1) establish the guilt of the accused beyond a reasonable doubt; (2) the circumstances proven must be in all respects consistent with the theory of the guilt of the accused; and (3) the circumstances proven must be inconsistent with any other reasonable theory than the guilt of the accused.

7.   In a prosecution for larceny, where the evidence does not point to the guilt of the accused to the exclusion of every other reasonable inference, the Court will withdraw the case from the jury.

(*September* 27th,  1910.)

Judges BOYCE and HASTINGS sitting.

*Andrew C. Gray*, Attorney-General, and *Frank M. Jones*, Deputy Attorney-General, for the State.

*James Saulsbury* for the defendant.

Court of General Sessions, New Castle County, September Term, 1910.

INDICTMENT FOR LARCENY (No. 56, September Term, 1910) of a pocketbook containing one hundred and twenty-five dollars, from George P. Fredericks, at Brandywine Springs Park on the eighteenth day of August, 1910.

The State proved that on the date of the alleged larceny, the Butchers and Grocers of Wilmington were holding a picnic at Brandywine Springs Park, and that the Park was filled with people. That after lunch, the prosecuting witness and some friends entered the Katzenjammer Castle, a place of amusement, containing a dark passage about three feet wide. This passage continued from the entrance around to the opposite side of the building to an exit. Both the entrance and exit were on the front of the building. There was no evidence that there was any other entrance or exit to or from the building. The prosecuting witness Fredericks testified concerning the larceny as follows:

It was about nine o'clock in the evening, when Mr. Joslyn, Mr. Cleaver, Mr. Johnson and Mr. Dean, and other friends of mine—eight or ten—and myself, came walking along by the Katzenjammer Castle and someone suggested that we go through.

There were four or five of the number who went through first. I hestitated about going through there on account of my ankle, but finally three of us followed them. We were far enough behind for them to get outside first and wait for us. When I entered the Castle I felt my pocketbook, which was a small one, in my right hip pocket. I was in my shirt sleeves. The pocketbook contained a hundred and twenty-five dollars, all in paper money consisting of fives and tens. Mr. Dean and I were together and I had one hand raised feeling along the wall and had hold of Mr. Dean's hand with the other hand and walking sideways. We had gone along the passage—which was so dark that no one could be distinguished,—very close to the outlet when I felt someone brush my elbow and a pressure on my pocketbook and felt somebody slip between me and the wall, and then I reached with my hand for my pocketbook and I said "my pocketbook is gone." From

all appearances, whoever the person was that brushed by me, he was back of us for some time, because I heard a friend behind say "Don't crowd in here; don't crowd in here; we will be through here in a very short time."

From the time I missed my pocketbook we were not over a half minute getting outside where our friends were waiting, and I told them that my pocketbook was gone. One of them went for an officer, and Mr. McVey, a special officer of the Park, was found. A description was given him by one of our party, of the man who had emerged from the exit of the Katzenjammer Castle just ahead of Mr. Dean and me. Mr. McVey, from that description, arrested the prisoner on a street car just at the edge of the Park. I was right behind Mr. McVey when he arrested the prisoner. He did not state to the prisoner what the charge was, but the prisoner said "I have not done anything. You are arresting the wrong man." Mr. McVey said: "Where are you from?", and he said "I am from Wilmington," and Mr. McVey said "Whereabouts in Wilmington do you live?", and he said "On Fourth street," and Mr. McVey said "At what number on Fourth street?", and the prisoner said "I don't want my poor mother to know it, for she will be crying if I don't get home." And Mr. McVey put the nippers on him and started off the car with him. Mr. McVey said to me in the presence of the prisoner, "Be careful he don't throw anything out of his pockets," and I watched him right after he got off the car, and he run his hand in his pocket and throwed back something and I said "Barney, you have got the right man." There was a headlight on the car, and I picked up what he had thrown down and saw that it was a return ticket from Wilmington to Philadelphia.

The witness Dean testified that four or five of the party of friends went in ahead of Mr. Fredericks and himself and that "it was not more than a minute after the others went in before we went in." Mr Fredericks had my hand over his shoulder and my other hand was up against the wall guiding me through, and a person got up against my elbow and seemed to be standing in front of me. I said "Keep on moving because it won't be but a minute or so before we will be out of here," and just about that

time the person went away from my elbow.   I didn't know who the person was.   It was too dark to distinguish anybody.   Mr. Fredericks said "Dean, I have lost my pocketbook" and I said "the best thing for us tő do is to get right out of here as soon as possible", and we got out in not over a half minute.   From the point mentioned where the person was I should say was seven or eight steps to the exit.   It was in the evening about nine o'clock and dark outside excepting the lights of the Park.   There was quite a crowd around and about the exit as we came out.   When they arrested the prisoner and searched him they did not find anything on him like a pocketbook, but they found seventeen dollars in money on him.

The witness Cleaver, one of the party who was ahead of the prosecuting witness, testified that after he had come out it was about five or ten minutes before Fredericks and Dean emerged. The witness further testified, "I was the second man to come out. There were three others with me who came out ahead of Mr. Fredericks and Mr. Dean.   I saw the prisoner come out of the Castle after I came out, before Mr. Fredericks or other members of the party came out.   I saw no one else come out excepting our own party and Mr. Dean and Mr Fredericks.   Nobody else came out between him and Mr. Fredericks and Mr. Dean, and I was in a position where I could see if anyone had come out. There were some girls in back of them, and I heard them squealing and making a noise.   I identified the prisoner as the man who came out.   I would not have paid any attention to the man if he had not made this expression: He said, 'My God, them people are scared to death in there', and I looked at him and got a glimpse of him, and I identified him as soon as Mr. McVey arrested him.   After he made that remark, he went off as if he was in a hurry."

When the State rested, Mr. Saulsbury asked the Court to instruct the jury to render a verdict of not guilty, because the prisoner had not been connected with the larceny, there being no evidence of the asportation of the pocketbook or money in question by the prisoner or possession thereof by him after the larceny.

After hearing argument, the Court rendered the following opinion.

BOYCE, J., delivering the opinion of the Court:

This is an application to give the jury binding instructions to return a verdict of not guilty because of the insufficiency of the evidence to warrant a conviction of the accused.

We have had the evidence introduced by the State read to us, and we have given the application before us careful consideration. Of course, it is incumbent upon the State, in order to warrant a conviction of larceny, to establish every material element of the crime. One of the elements of the crime of larceny is the asportation of the alleged stolen property by the accused. This may be shown by direct or circumstantial evidence. In this case, the State has shown the asportation by someone of the property described in the indictment, but the question raised by the application before the Court is, has the State shown an asportation by the accused? The State has not shown or attempted to show by positive testimony that the accused took the property described in the indictment, but relies wholly upon circumstantial evidence,—such as is now before the jury. Circumstantial evidence, when it establishes, or strongly tends to establish, the guilt of the accused may like positive testimony be relied upon for a conviction. But when circumstantial evidence alone is relied upon for a conviction of a crime, the evidence must be such as to create in the mind more than a mere suspicion. It must be of such a character and strong enough to exclude any reasonable inference or conclusion other than that the accused is guilty of the crime charged. Mere probability of guilt is not enough. The evidence must be of such a character as (1) to enable the jury to find the crime proved beyond a reasonable doubt; (2) that the circumstances proven be in all respects consistent with the theory of the guilt of the accused; and (3) that such circumstances be inconsistent with any other reasonable theory than the guilt of the accused. We do not think the evidence adduced in this case, in view of all the surroundings attending the alleged larceny,

meets this test. The evidence does not point to the guilt of the accused to the exclusion of every other reasonable inference which it must do to warrant a conviction. If we should submit this case to the jury, and they should find the accused guilty under the evidence before them, we would feel constrained to set the verdict aside. And we are, therefore, of the opinion that we should instruct the jury to return a verdict of not guilty.

Gentlemen of the jury:—You are instructed to return a verdict of not guilty.

Verdict, not guilty.